## Coral Ridge Clay Products Company v. Collins.

(Decided November 1, 1918.)

### Appeal from Jefferson Circuit Court
### (Common Pleas No. 2)

1.  **Master and Servant—Safe Place to Work—Ordinary Care to Provide.**—There is a primary duty, incumbent upon an employer to exercise such care as an ordinarily prudent man would take, to provide his servant with a reasonably safe place in which to perform his duties, and if the employer knows, or could by the exercise of ordinary care, have knowledge of the unsafe condition of the place, and the servant does not know, and could not by exercising ordinary care, in the performance of his duties, discover the danger, and the servant sustains an injury from the unsafe condition of the place, the employer is liable in damages for the injury.

2.  **Master and Servant—Assumption of Risk.**—Where the place assigned a servant to work, is not reasonably safe for the performance of his duties, and he becomes apprehensive of danger, and so reports to his employer, who assures him of the safety of the place, and directs him to continue his work in the place, the servant does not assume any risks from the danger, unless it is so open and obvious, that no prudent man would encounter it, and as to whether or not the danger is so open and obvious, as a matter of law, as to justify a directed verdict against an injured servant, the probability of the danger must be such, that men of ordinary prudence and judgment, would not differ about it, otherwise, it is a question for the jury.

3.  **Master and Servant—Indemnity Insurance—Evidence.**—In an action for damages for a personal injury, sustained by a servant, against an employer, who is insured against such losses by an indemnity insurance company, the evidence of the fact of such insurance, must not be dragged into the case, and is not competent, unless it is necessarily developed, by the introduction of competent evidence upon some issue, in the case.

4. **Master and Servant—Indemnity Insurance—Evidence.**—In an action by a servant against an employer for a personal injury sustained in his service, and the employer is protected by indemnity insurance, and the employer defends the action upon the ground of a settlement with and a release by the servant, who seeks to avoid the effect of the release, by pleading, that it was obtained by fraud and coercion, and the agents of the insurance company testify upon the issue of fraud, in contradiction of the servant, the agents may be required to testify to their connection with the insurance company and incidentally, the existence of the insurance, for the purpose of showing their interest, in the matter, as affecting the credibility of their testimony.

5. **Witnesses—Non-Expert Witnesses.**—Non-expert witnesses are competent to state their opinions, touching the mental soundness or unsoundness of a person under investigation, after they have shown, by acquaintance, association with, and observation of such person, an opportunity to form an opinion.

BLAKEY, QUIN & LEWIS for appellant.

P. D. CRAWFORD and H. M. DENTON for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

The appellee, John Collins, a young man of about thirty-three years of age, was employed as a laborer, by the appellant, Coral Ridge Clay Products Company, which was engaged in manufacturing bricks and other products of clay, at its plant, near South Park, in Jefferson county. The clay was brought into the plant by cars, upon an elevated tramway, and dumped into a shed room, which was separated from the "pan" room, or where the clay was made into finished products, by a wall. Underneath the floor of the shed room, were two troughs, in which belt conveyors were operated, which carried the clay into the "pan" room. These troughs were covered by loose boards, laid upon the floor, so that the clay could not come into contact with the belts, except in the quantities desired. The clay was dumped from the cars, on, the overhead tramway, into the floor of the shed room, and was pulled into the troughs, and upon the belt, which carried it into the "pan" room. The pulling in of the clay, into the troughs, was called "feeding the belts," and the servant, who performed this service was called a "feeder." The "feeding" could be done from either side of the room and was done by removing one of the boards from over the trough, and pulling in the adjacent

clay, and then another until all the clay should have been
"fed" in. The feeder, in his operations used a hoe, with
a stout hickory handle, about two and one-half feet in
length. Against the wall of the shed room, adjoining the
"pan" room, was a platform, several feet from the floor,
and upon which stood a motor.

The appellee, Collins, had been working as a laborer
at this plant for over a year, and had at different times
"fed the belt" in each of the troughs. On the morning
of June 22, 1915, he was set to work "feeding" one of
the belts, at the end of the room, adjoining the "pan"
room. According to his statement, on this occasion an un-
usual quantity of clay had been piled into the room, be-
cause the manager or foreman was apprehensive of rain.
Hence, the place where he was set to work was very
much restricted in size. The clay was heaped upon each
side of him, and in front, from a height of five feet, to
near the ceiling, and the place, where he must work was
reduced to a very small space. The cars were continu-
ing to bring in and dump clay into the room, and it was
also, dumped in the rear of him. He became appre-
hensive of danger to himself from the dumping of the
cars, and made complaint to the foreman, stating that he
feared it was dangerous, to work in the place where he
was. The foreman then took him to the other side of the
room, but, finding no place, in which he could work there,
he brought him back to the end of the room, where he
had been at work, when he made the complaint, and stat-
ing that there was no other place, in which he could
work, than the one, where he had been working, and as-
sured him, that there was no danger of his working at
that place, if he would go under the platform, upon which
the motor stood, when the cars were being emptied of
their contents, and that when the cars should return to
the "pit" to be reloaded, for him to go on "feeding."
He obeyed the instructions of the foreman, and when
the cars would come in on the overhead tramway, that
he went under the platform, and remained, until their
contents were emptied, when he would return to work.
In front of him and right over the trough, there was a
large clod of clay, or shale, which weighed from three
hundred and fifty to five hundred pounds. It was covered
with dirt, and was far enough away from him, that he
did not think, that in "feeding" in the clay, that he

would reach it before the noon hour. At that time, it was about from thirty minutes after seven, to eight o'clock. Shortly, after the foreman had assured him, that there was no danger, in the place, if he would go under the platform when the cars were being unloaded, he placed his hoe under a board to remove it, when the large clod fell upon the handle of his hoe, pressed the end of the handle into the right side of his abdomen, and the weight of the clod crushed him down into the clay, at his side. He called for help and the "feeder" of the other belt ran to his assistance, but, was unable to remove the clod or to extricate him. Another man came to his assistance, and the two succeeded in extricating him. He was unable to continue working. The company manager called a physician, who removed him, in a buggy, to his home, where he was confined to bed for four weeks, and had not been able to perform manual labor up to the time of the trial, which was twenty months afterwards.

He stated, furthermore, that the blow and pressure of the hoe against his abdomen had caused him to be afflicted with a hernia, and that he had been caused to suffer a great deal of pain. He was corroborated as to the manner, in which he received his injuries, by the two men who extricated him from his position under the clod. He was corroborated, as to the extent of his injuries by two physicians, who testified, that his injuries were permanent. His statement as to the conditions in the shed, at the time of his injury, and as to his making complaint of his apprehension of danger and the assurance, that the place was safe, was contradicted by the foreman and certain physicians testified, that he had not suffered any injuries. A little over two months, after the clod fell upon him, he was taken by the physician, who waited upon him, into Louisville, to see the manager of appellant, who then called into the meeting, two agents of an insurance company, which had insured appellant against damages for injuries suffered by its employes, and a settlement was made between appellee and appellant, by which Collins received sixty dollars, and his physician, sixty-five dollars, and Collins, then executed a release to appellant.

Some months, thereafter, appellee instituted this action against appellant to recover damages for his in-

juries, basing his action upon the alleged negligence of appellant in failing to use ordinary care to provide him a reasonably safe place, in which to work, and which he alleged, resulted in his injuries.   The appellant denied any negligence upon its part, and relied upon a plea of contributory negligence, and, also, pleaded the settlement with and release executed by appellee in bar of his action. The appellee denied that any negligence upon his part contributed to his injuries, and alleged that the settlement and release relied upon were procured by fraud, misrepresentation and coercion of appellant, and tendered to it, the amount received by him through the alleged pretended settlement and release.   The allegations of faud, misrepresentation and coercion were denied by a surrejoinder.   A trial of the action before the court and a jury, resulted in a verdict and judgment for $1,000.00 in damages, in favor of appellee.   The appellant's motion for a new trial was overruled, and it has appealed, and seeks a reversal of the judgment upon five grounds.

(1)   The court erred in overruling appellant's motion for a directed verdict in its favor, at the close of the evidence for appellee and at the close of all the evidence.

(2)   The evidence as to the appellant being insured against damages for injuries suffered by employes, was erroneously admitted.

(3)   The evidence as to fraud or coercion in obtaining the setlement was insufficient to sustain the verdict.

(4)   The instruction relating to an assurance of the safety of the working place by appellant, was erroneous.

(5)   The testimony of non-experts as to appellee's soundness of mind was not competent and was erroneously admitted.

(a)   The doctrine is elementary, that it is the duty of the employer to exercise ordinary care, to provide his servant with a reasonably safe place, in which to perform the duties, to which he assigns him.   If the employer has knowledge, or if by exercise of that care, which a prudent man would employ, to know the condition of the servant's working place, would have knowledge, that the place was unsafe, and the servant does not know of its unsafe condition, and could not discover it, in the performance of his duties, by the exercise of such care as a prudent man would employ under the same

circumstances, and the unsafe conditions cause the servant to sustain an injury, the employer is liable to him in damages.

It is, also, well settled by many adjudications of this court, that if the place assigned the servant to work is unsafe and the servant is apprehensive, that, it is dangerous, and so represents to the employer, who assures him, that it is safe and directs him to proceed with the work, the servant may rely upon the opinion of his employer, and does not assume the danger of continuing to work, in the place, if the danger is not so open and obvious that an ordinarily prudent man would not risk it. I. C. R. R. Co. v. Hart, 23 R. 1054; Waik & Co. v. Price, 2 R. 696; Long v. I. C. R. R. Co., 24 R. 528; Lash v. Stratton, 101 Ky. 672; Smith v. Ky. Lumber Co., 25 R. 1386; Yellow Poplar Lumber Co. v. Bartley, 164 Ky. 763; Stewart Dry Goods Co. v. Boone, 175 Ky. 273; I. C. R. R. Co. v. Keeler, 27 R. 305, 84 S. W. 1167; L. & N. v. Adams, 148 Ky. 513; 147 S. W. 384. It being the employer's duty to provide the servant a safe place, in which to work, it is his duty, to take care to make an inspection to discover any unsafe conditions, which exist, and for that reason, the servant may rely upon an assurance of safety from the employer. In the instant case, the appellee, although he testified, that he was apprehensive of danger, in continuing his work, in the shed, because of the large quantities of clay, which were upon the floor, and more was being constantly thrown in, and the place of his work was so restricted, in size, that he made complaint to the foreman, who took him to the other side of the room, and not finding a place there suitable to work in, directed him to return to the place where he was engaged, when he made the complaint, and assured him, that he would not undergo any danger, if he would go under the platform when the cars were being emptied, and to continue his work. Relying upon this assurance of safety and in obedience to the command, he continued to work. The large clod seems to have been thrown in after that time, and appellee saw it, but was of the opinion, that he would not come in contact with it, in "feeding" in the clay, for several hours. The danger from the clod, was not so open and obvious, that an ordinarily prudent man, would not have continued to work as appellee did. This court has, in some instances, directed a verdict against a

plaintiff, on account of assumed risk, where the danger was so certain and obvious, that there could be no difference of opinion among prudent men, as to the probability of the danger, but, where the probability of injury is such, that ordinarily prudent men will differ as to its certainty, the question is one for the jury. It is true, the foreman contradicted the appellee, as to the conditions in the shed, and as to the assurance of safety, but, the truth of the matter was one for the jury. Hence, the motion for a directed verdict was properly denied.

(b)   Upon the issue made, touching the alleged settlement and release, the appellant offered as witnesses, the two parties, who negotiated with appellee the settlement and procured the release, and both of these parties testified in contradiction of appellee, in regard to that matter, and that the settlement was fairly made and the release procured without any fraud, overreaching or coercion of the appellee. Upon their cross-examination, they were asked, and over the objection of appellant, required to answer and state, that they were representatives of an indemnity insurance company, which insured appellant against damages suffered on account of injuries to its employes, while engaged in its service. This ruling of the court is complained of as a prejudicial error. The court, however, admonished the jury, upon the admission of this testimony, that it should not consider it for any purpose, except for the purpose of showing the interest of these witnesses, and to aid it in determining the weight to be given to their testimony, and that it ought not to find a verdict for one party or other, because of any connection, which the insurance company might have with the matter. This court has, consistently, held, that it is error to permit testimony, to the effect, that a defendant, in an action for damages, is protected by indemnity insurance, and that such evidence is not competent. Dow Wire Works v. Morgan, 96 S. W. 530; Owensboro Wagon Co. v. Bowling, 107 S. W. 264; Kentucky Wagon Manufacturing Co. v. Duganics, 113 S. W. 128; Duncan Coal Co. v. Thompson's Admr., 157 Ky. 304; Netter v. Caldwell, 173 Ky. 200. The principle, laid down, in those cases, is adhered to, and such testimony should be excluded, in every action, where it does not shed any light upon any issue. An examination of the actions, wherein it has been held by this court,

that such testimony was incompetent and prejudicial, have been cases, in which there was no issue as to a settlement having been made, as in this case, and it was held, that it was not competent to prove the mere fact of the defendant having indemnity insurance, as such evidence shed no light upon the issues being tried, nor gave any aid in determining whether the plaintiff had or had not a cause of action. In such cases, it is apparent, that such testimony was offered for no reason, except to create a prejudice in the minds of the jury, or to induce it to find a verdict for the plaintiff, because of the fact, that the defendant would not be required to satisfy it. In the instant case, however, the effect, that should be given the release, which appellant relied upon depended largely upon the testimony of those two witnesses. They contradicted the testimony of the appellee, in reference to it. They showed themselves, by their cross-examination, very antagonistic to the cause of appellee. One of them claimed to be an attorney for the appellant, but was not an attorney of record. The other, by his examination in chief, failed to show any interest upon his part, in the matter. The fact was, as developed by the questions objected to, that the attorney was a salaried officer of the insurance company, and the other was a professional adjuster of claims against such companies, and in the employ of the salaried officer. The appellee's mark, by which he signed the paper, offered as a release, was attested by one of these parties, and it purported to be sworn to before the other, as a notary public. It would have been manifestly unfair to the appellee to have permitted one of these parties to have posed before the jury as entirely disinterested, and the other merely as counsel for appellant, while it was being attempted to bar his action by a release, which he claimed had been obtained from him by fraud, overreaching and coercion, and which these witnesses had obtained from him, and in support of which they were testifying. The general rule applying to the cross-examination of a witness makes it permissible to require a witness to show his kinship, business connection, employment and any other fact or circumstance, from which it can be reasonably concluded, that his testimony would be favorable to one party or the other. There is no apparent reason to depart from this general rule in this case, and we are of the

opinion, that the court did not err, in requiring these witnesses to disclose their relationship with the insurance company, for whom they were really acting, followed by the admonition, which the court gave to the jury. The testimony as to their connection with the insurance company was competent to show their interest, in procuring and sustaining the release, but, for no other purpose. Hedlam v. Holy Terror Mining Co., 92 N. W. (S. D.) 31; Brambell v. Cin. F. & S. E. R., 132 Ky. 547; Louisville Veneer Mills Co. v. Clement, 109 S. W. 308, 40 Cyc. 2670; Raymond v. Rutland Ry. Lighting & Power Co., 98 Att. 909; May Quon v. M. Furuga Co., 143 Pac. 99.

(c)  Upon the issue made as to the alleged wrongful obtention of the release, the appellee was very much overborne, as regards the number of witnesses, but, when all the facts and circumstances touching the transaction are considered, in does not appear, that there was not sufficient evidence to sustain the jury's finding. The appellee was shown to have been a very ignorant and weak-minded young man. He was unable to read and write, and though he had spent his life within ten miles of Louisville, he had been in the city, but four or five times, and on those occasions, he was accompanied by a member of the family. The physician, whom the appellant had called to render appellee first treatment, had visited him thirty-seven times, and was very apprehensive that unless a settlement was effected, that he would be unable to collect his bill, and was using his influence strongly to induce an acceptance of a settlement at any sum, provided he obtained the payment of his bill. He procured an automobile and took appellee, into the city, upon the suggestion, that the president of appellant company, wanted to have a personal conversation with him. Appellee consented to go, if his brother would accompany him, but, the brother could not go, because the automobile was loaded. Appellee says, that the physician, upon whom he relied to take care of him, in the transaction, threatened, that, if he did not accept the offer made for a settlement, he would take his cow and pig, in satisfaction of his bill. The appellee, alone, and without advice, was confronted by the two agents of the insurance company, his own physician and the president of the company, and the result was, that he obtained sixty dollars, in satisfaction of an injury, for

which the jury thought that he was entitled to $1,000.00, and his physician obtained, in the same transaction, sixty-five dollars, and then testified, that appellee had not suffered any injury, and that only twelve of his visits, to him as a physician, were necessary to have been made. One of the agents of the insurance company, who negotiated the settlement, had made appellee four visits at his home, and the other had made one visit, and tried to procure him to settle for $50.00, which, according to their statement, had been persistently refused by appellee, until his presence was procured in the city. One of these agents, confesses, that appellee was weak, mentally.

(d)   The appellant insists that, in as much, as there was not an averment, in the pleading, of the assurance of safety as to the place of work, by the foreman, after complaint by the appellee, the court was in error, in instructing the jury touching the law, applicable to such a state of facts, as was presented by the evidence of appellee upon that subject, and for such reason a reversal of the judgment should follow. This contention is not tenable, since the instruction, complained of, does not relate to another and different ground of negligence, from that relied on in the petition. The rule, which provides, that when a plaintiff, in an action for damages for a personal injury, specifically sets out in his petition, the acts of negligence relied upon, the proof of other and different acts of negligence, than those relied upon in the pleading, can not be proven, and hence, touching which it is error for the court to instruct, does not have application, in this case. Besides, no objection was interposed to the evidence, which proved the complaint of appellee and the assurance of safety and direction to continue his work, by the foreman. Both, plaintiff and defendant, offered proof upon this subject, and tried the case, as if the complaint of appellee and the assurance of safety were specifically set out in the pleadings. The appellant could not have been misled to its prejudice, by any variance between the pleadings and the proof, touching the matter complained of. Upon the trial, the court's attention was never called to any variance between the pleadings and evidence, and really, there was no variance, and the instruction related only to the rights of the parties, relating to the negligence relied

upon in the petition. C. St. L. & N. O. R. R. Co. v. Wilson, 25 R. 525; I. C. Ry. Co. v. Smith, 133 Ky. 732; section 130 Civil Code.

(e)   After a physician, who had had a long acquaintance with the appellee had testified, that his mental capacity, was very low, and that in his opinion, he was unable to make or understand a written contract, other witnesses were introduced, who were non-professional persons, upon the subject of appellee's mental capacity, and these were permitted to give their opinion, touching the soundness of his mind. The statements of these witnesses were objected to, by appellant, but its objections were overruled. The opinions of the non-professional and non-expert witnesses as to the soundness of mind of a person, under investigation, are competent, where it is first shown, that the witnesses have had an opportunity, by acquaintance, association and observation, to form such an opinion. The competency of the opinion of the witness does not depend upon his ability to state specific facts, which of themselves show soundness or unsoundness of mind. Of course, it is competent for the witness to detail facts, which of themselves show soundness or unsoundness of mind, as the basis or reason for his opinion, and upon cross-examination, inquiry may be made of him, touching the existence of such facts, within his observation, for the purpose of ascertaining how much weight should be given to his opinion. Brown v. Com., 14 Bush, 398; Moore v. Com., 92 Ky. 637; Jolly v. Com., 110 Ky. 195; Portwood v. Com., 104 Ky. 601; Ball v. Com., 81 Ky. 665; Phelps v. Com., 17 R. 708; Mathly v. Com., 27 R. 787; Wright v. Com., 24 R. 1842; Newcomb v. Newcomb, 96 Ky. 123; Abbott v. Com., 107 Ky. 628. The witnesses, whose opinions were objected to, in the instant case, before being called upon for their opinions, showed, that they had been intimately acquainted, and associated with appellee, some of them, from his earliest youth.

The judgment is therefore affirmed.